THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SHERLEEN RODRIGUEZ, Defendant-Appellant.

Second District   No. 2—86—0883

Opinion filed April 29, 1988.

G. Joseph Weller and Paul J. Glaser, both of State Appellate Defender's Office, of Elgin, for appellant.

Fred L. Foreman, State's Attorney, of Waukegan (William L. Browers and Virginia M. Ashley, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE LINDBERG delivered the opinion of the court:

Defendant, Sherleen Rodriguez, appeals from her conviction of child abduction (Ill. Rev. Stat. 1985, ch. 38, par. 10—5(b)(1)). After a jury trial, defendant was found guilty of violating a court order by concealing her daughter from her former husband, the custodial parent, Jose Rodriguez. The court sentenced defendant to three years' imprisonment. On appeal, defendant contends that the State failed to prove beyond a reasonable doubt that she acted with the intent to violate a valid court order, that she concealed her daughter, Leticia, and that a valid court order existed.

According to Jose's testimony, he married the defendant in 1974, and they were divorced in 1976. The trial court awarded defendant custody of Leticia, who was born in 1975, ordered Jose to pay $25-per-week child support, and provided Jose with visitation rights. When Jose attempted to visit Leticia, defendant's second husband beat him. In July 1977, Jose told the defendant that he would try to get custody of Leticia. On February 16, 1978, the court entered an order awarding Jose custody. Defendant communicated with Jose by mail and telephone after she received the court order. Defendant refused to disclose where she and the child were residing. During one conversation, Jose informed defendant that he obtained a court order awarding him custody of Leticia. Defendant responded, "You will never get her anyway."

Jose did not know where defendant was living and had not seen her or Leticia until 1981. In 1981, Jose arrived at Helen Hanni's home and discovered defendant and Leticia visiting. After that encounter, Hanni arranged for Jose to visit Leticia three times in 1982.

On March 31, 1982, Jose filed a *habeas corpus* petition for the return of his daughter, relying on the previous custody order. Defendant responded by moving to vacate the custody order based on her assertion that the notice of defendant's petition for visitation was not sent to her residence in Texas. Defendant claimed that Jose knew her whereabouts but failed to give her notice of the hearing. Jose testified that defendant went to court on one scheduled day for resolution of

the *habeas corpus* petition and shouted at his current wife, Dina. Defendant never returned to court, and the court never ruled on Jose's petition or defendant's motion to vacate.

Jose also testified that defendant telephoned him on July 23, 1982, requesting him to "get off her back." Jose related to the defendant that he had custody of Leticia, but defendant told him that he would never see her again. Defendant claimed that the order was invalid since she was in Texas at the time the order was issued. Further, defendant indicated that she would hide Leticia by constantly moving. If Jose attempted to see Leticia, defendant threatened to "blow his brains out."

An attorney in Portland, Oregon, requested Jose to retrieve Leticia as her mother was in jail. Jose brought Leticia to live with him and Dina until February 17, 1983, when defendant took Leticia away from him.

Dina testified that Leticia walked to school on February 17, 1983, but did not return home at 2:30 p.m. Defendant telephoned Dina that afternoon stating, "I am Lettie's mom and I take Lettie because she is my baby." Twenty minutes later, defendant telephoned again and proceeded to call Dina names.

Officers Fermaint and Woolbright located Leticia on April 28, 1986, and arrested the defendant. While Officer Fermaint advised the defendant of her rights, defendant used vulgar language describing Jose. Defendant told the officer that she had arranged with Leticia that if they were separated, Leticia would run away from Jose and call her so she could get her. Additionally, defendant stated that Jose had no legitimate right to Leticia even though she knew a court order awarded Jose custody because she had not appeared in court. Defendant indicated that she was served with documents while she was living in the State of Washington which stated that Jose had custody of Leticia. Jose came to Washington and brought Leticia to his home in North Chicago. About one month later, defendant went to North Chicago and noticed Leticia walking to school, so she took Leticia and left the city. After the arrest, defendant informed the officer that Leticia, instead of keeping her appointment with a counselor, telephoned defendant for defendant to get her.

Mario Perez, an attorney, testified that he represented Jose in a custody matter and in a support action against him brought by the Department of Public Aid. Perez learned that defendant initially had custody of her daughter, but in 1977, Jose petitioned the court because he was not getting the visitation rights pursuant to a prior order. According to Perez, he sent a notice of motion to defendant and

her attorney of record that on December 12, 1977, Judge Kaufman was going to hear arguments on Jose's petition for a rule to show cause why defendant should not be held in contempt of court, for permission to take Leticia to Mexico in 1978 for one month, for an injunction against defendant enjoining her from removing Leticia from the court's jurisdiction, and for such other relief as the court deemed appropriate. Without further notice, the court continued the matter for hearing until January 9, 1978. Jose retained another attorney, Steve Carmick. On January 12, 1978, the court entered an order which stated, *inter alia*, that all parties had been duly notified and that on February 15, 1978, a hearing was scheduled to determine and adjudicate the custodial rights of Leticia Rodriguez, and that the matter was continued without further notice.

An order entered on February 16, 1978, indicated that all parties had been duly notified and that the court found that the best interest of Leticia necessitated awarding custody to Jose. The court ordered defendant's custody rights terminated. Perez reviewed the file and found this order valid and attempted to enforce Jose's custodial rights by filing a *habeas corpus* petition in March 1982. Perez's office mailed a notice of motion to the defendant on April 3, by certified mail. On April 9, the postal department delivered the letter to Jose Barunda, defendant's then current husband. The petition recited that Jose had been awarded custody of Leticia.

Defendant's attorney filed a motion contesting the validity of the court's order of February 16, 1978. The court never heard defendant's motion. Defendant appeared on the first hearing date for the *habeas corpus* petition, but she failed to appear on the nine rescheduled dates sought by defendant's own attorney. On August 2, the court heard some testimony from Jose and a witness and rescheduled the hearing in order to have the defendant present. On the next court date, defendant did not appear and was apparently not living in the area, so the court rescheduled the hearing. Jose filed a notice to produce the defendant and Leticia for the next court date; however, defendant and Leticia never appeared.

Perez admitted on cross-examination that Jose's original petition did not request a change of custody. The petition did ask for other relief that the court found equitable and just under the circumstances. Defendant's attorney asked Perez whether an attorney would contemplate the possibility of a custody change on the basis of the request for other relief in the order. Perez answered affirmatively but stated that a lay person might not understand. Perez revealed that there were no individual notices of motion indicating continuances of the

hearing, yet the recitation in the order of the court stated that notice had been given. According to Perez, if she followed the proceedings, the defendant would know of the continuances.

For the defense, defendant denied receiving notice in 1977 or 1978 of the custody proceedings or documents that her custody had been terminated. The defendant claimed that she was living in Texas at the time but also admitted that Jose told her during a telephone conversation about the change in custody. Jose visited Leticia after the court order and told the defendant that he was "going to get my daughter by the law." Defendant's husband at that time punched Jose. After that incident, defendant, Leticia, and Jose communicated by telephone. Allegedly, defendant offered Jose Leticia for the summer months, but Jose refused.

In 1982, while defendant and Leticia were living in Oregon, defendant received a petition filed by Jose which she thought meant Jose wanted custody of Leticia. Subsequently, defendant moved to Washington, where she was imprisoned. Authorities requested Jose to go to Washington and take the child to live with him in Illinois. According to defendant, she consulted a lawyer and learned of the custody petition but did not understand that a formal order existed.

Defendant also testified that when Jose refused to pay child support, she had a conversation with him regarding custody. Defendant allegedly stated, "Well if you got custody aren't you going to take the child and support her" and "if you are not, if I am going to keep her, why aren't you paying me to take care of her or support her?" Jose allegedly responded that he did not have to take care of Leticia since, regardless, he would always be her father.

Defendant admitted receiving the notice for hearing on the *habeas corpus* petition wherein it stated that a change of custody order had been procured. She did not believe it. Defendant disputed that she had written a letter to Jose's attorney, Steve Carmick, after receiving the custody order. Instead, defendant claimed that she wrote the letter after the divorce was final. The contents of the letter included:

> "I told you what I would do if you ever gave me any bullshit about Cookie. I am moving Monday and there will be no more Lettie or whatever the hell you call her. I am legally changing her first name. I hate that stupid name. I am just sorry she can't get rid of Rodriguez. She's going by Barunda, anyway. But you will never get her from me anyway. I would die before I would let an idiot like you raise my daughter. You can take your $25 a week and shove it up your tight ass, because she don't need it. You don't even need to put it in to any trust

fund. Tell your lawyer that also. P.S. I am glad you pulled this shit, because I have been wanting to move from this terrible state. It don't agree with my sinus cavities. I will tell Cookie you died in a car accident. She will never know any different. And don't try to find out from my family where I am, because there isn't a one who I write to and that is including my mother. So you got what you wanted. You don't have to pay no support. So try to find Cookie, okay? Happy hunting, you stinking ugly-ass spic. The only way you will ever get her is over her and my dead bodies."

Defendant claimed that after writing this letter, she informed Jose of her whereabouts. Defendant also claimed that she changed Leticia's name only to correspond with her current husbands' surnames and not to conceal Leticia from Jose.

■■ ■ Defendant contends on appeal that reasonable doubt existed whether she acted with the *intent* to violate a valid court order. Section 10—5(b) of the Criminal Code of 1961 provides:

"A person commits child abduction when he or she:

(1) Intentionally violates any terms of a valid court order granting sole or joint custody[, care or possession] to another, by concealing or detaining the child or by removing the child from the jurisdiction of the court ***." (Ill. Rev. Stat. 1985, ch. 38, par. 10—5(b)(1).)

(See *People v. Caruso* (1987), 119 Ill. 2d 376, 519 N.E.2d 440.) Defendant argues that she acted without notice of the order terminating her custody and with the belief that the order, if it existed, was invalid. Intent is a question of fact for the trier of fact, and a jury's verdict will not be disturbed unless the supporting evidence is improbable, unconvincing, or contrary to human experience. See *People v. Larson* (1987), 158 Ill. App. 3d 135, 139, 511 N.E.2d 191, 194.

■■ The evidence would permit a jury to conclude that when defendant removed Leticia from school on February 17, 1983, she intended to violate the order awarding custody to Jose. Defendant admitted that Jose told her about having custody in many telephone conversations. Defendant admitted also receiving the petition for *habeas corpus* wherein it was alleged that the order had been entered. Further, defendant received documents in Washington that explained why Leticia was going to Illinois to live with Jose. Defendant confessed to the police officers upon her arrest that she understood there was an order to the effect that the custody had changed, although she did not believe it was valid. Additionally, defendant's attorney in Washington advised her to contest the validity of the custody order in Illinois.

Therefore, the jury could reasonably infer from this evidence that the defendant knew of the court's order and intentionally violated it.

Defendant also contends that the State did not prove that she intended to conceal Leticia from Jose. Defendant alleged that she told Jose where she and Leticia were living one month after sending him a letter. Jose, however, testified that he did not know where his daughter was living. The jury's function is to assess the credibility of the witnesses, to determine the weight to be given to such evidence, and to evaluate the inferences to be drawn from it. (*People v. Jarvis* (1987), 158 Ill. App. 3d, 415, 425, 511 N.E.2d 813, 819.) In this case, the jury could properly find Jose more credible than the defendant, who, we note, had a prior theft conviction. Additionally, in light of the letter the defendant mailed to Jose's attorney wherein she stated "and don't try to find out from my family where I am, because there is no one who I write to and that is including my mother," the jury could infer that the defendant intentionally concealed Leticia from her father. Moreover, the evidence indicated that defendant changed her name several times, repeatedly changed Leticia's name, even changed her first name, and moved seven times, including out of State, between 1978 to 1986. We conclude that there is ample evidence in the record to support the jury's finding that defendant had intended to conceal the child.

Defendant also contends that the State failed to prove her guilty beyond a reasonable doubt where there was no valid court order awarding Jose custody. Our review of the record reveals that defendant's position on appeal is inconsistent with her arguments before the trial court. Also, defendant raises this issue for the first time on appeal. At trial, defendant's attorney conceded that the only dispute was whether defendant was aware of the court order granting custody to Jose. During arguments in support of her motions for a directed verdict, the defense counsel only argued that defendant did not intend to violate a court order because she did not believe one existed. Defendant's attorney indicated that the case centered around defendant's knowledge and intent. Counsel never argued that the order awarding Jose custody was void. Defendant's failure to argue this point before the trial court waived this issue on appeal. *Navistar Financial Corp. v. Allen's Corner Garage & Towing Service, Inc.* (1987), 153 Ill. App. 3d 574, 579, 505 N.E.2d 1321, 1324-25.

Defendant argues on appeal that due to the closeness of the evidence on the record, this court should take notice of the erroneous nature of the custody order as a matter of plain error. (107 Ill. 2d R. 615(a).) However, our review of the record reveals no such error as

the court order modifying custody was valid for the purposes of the offense of child abduction. Defendant's arguments attack the order alleging that Jose did not file a sufficient petition to modify the custody award pursuant to the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 601(d)). Defendant has not provided this court with any authority that review of a child abduction conviction necessitates a finding that the original order was correct.

■ By analogy, we consider persuasive the established doctrine that persons subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed even if they have proper grounds to object to this order. (*GTE Sylvania, Inc. v. Consumers Union of the United States, Inc.* (1980), 445 U.S. 375, 386-87, 63 L. Ed. 2d 467, 477-78, 100 S. Ct. 1194, 1201-02.) An injunctive order entered by a court having jurisdiction over the person and the subject matter is not void, and although it may be declared erroneous, it, again, as a general rule, must be obeyed and will support a contempt order. (*Cooper v. Rockford Newspapers, Inc.* (1977), 50 Ill. App. 3d 250, 252, 365 N.E.2d 746, 748.) Whether the order is erroneous does not become an issue in a contempt proceeding arising out of disobedience of that order. *County of Lake v. Spare Things* (1975), 27 Ill. App. 3d 179, 183, 326 N.E.2d 186, 188-89.

■ The rationale is that a voidable order is one entered erroneously by a court having jurisdiction and is not subject to collateral attack; by contrast, an order issued without jurisdiction is void and may be attacked either directly or indirectly at any time. (See *County of Lake*, 27 Ill. App. 3d at 183, 326 N.E.2d at 188.) In order for the custody order to be considered void, the defendant must establish that the court never obtained jurisdiction over either the subject matter or the person. The trial court in this case originally awarded custody to the mother and has continuing subject matter jurisdiction over the matters affecting the child of the divorced parents. (See *In re Custody of Sexton* (1981), 84 Ill. 2d 312, 320, 418 N.E.2d 729, 733.) The order on its face indicated that all parties were notified and that the court retained jurisdiction over the parties. The court apparently had jurisdiction to enter the order. (See *Donlon v. Miller* (1976), 42 Ill. App. 3d 64, 71-73, 355 N.E.2d 195, 199.) Therefore, defendant violated a valid custody order when she took Leticia away from Jose.

The judgment of the circuit court of Lake County is affirmed.

Affirmed.

WOODWARD and UNVERZAGT, JJ., concur.